In re GOVERNMENT SECURITIES CORPORATION, Debtor.

John R. CAMP, Jr., Trustee, and the Securities Investor Protection Corporation, Appellants,

v.

Enrique A. MOREY, Sr., Appellee.

Civ. No. 88–1275.

United States District Court, S.D. Florida.

Dec. 12, 1989.

Blackwell, Walker, et al., Miami, Fla., for debtor.

Theodore H. Focht, Michael E. Don, Josephine Wang, Securities Investor Protection Corp., Wash., D.C., for appellants.

Saturnio E. Lucio, II., Silvia M. Garrigo, Miami, Fla., for appellee.

## MEMORANDUM OPINION

### ORDER REVERSING BANKRUPTCY COURT

SPELLMAN, District Judge.

THIS CAUSE comes before the Court upon the consolidated appeals of John R. Camp. Jr., Trustee, and Securities Investor Protection Corporation (hereinafter "SIPC"),[1] from a decision of the Bankruptcy Court for the Southern District of Florida, allowing the Claimant/Appellee, Enrique A. Morey, Sr., to file a claim against the Debtor, Government Securities Corporation (hereinafter "GSC"), after the statutory bar date in a liquidation proceeding under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. (hereinafter "SIPA").[2]

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction of these consolidated appeals pursuant to 28 U.S.C. § 158(a).

## STANDARD OF APPELLATE REVIEW

On an appeal from a SIPA proceeding, a district court is to conduct a de novo review of the bankruptcy court's conclusions of law. In re Stalvey & Assocs., 750 F.2d 464, 468 (5th Cir.1985). However, the bankruptcy court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Bankr.R. 8013.

## PROCEDURAL HISTORY

On an application by SIPC, this Court (per Hastings, J.) entered an order on May 12, 1987, placing GSC, a broker-dealer in United States Government securities, into liquidation under SIPA,[3] and appointing John R. Camp, Jr., Esquire, as trustee to administer and oversee the liquidation of GSC. Pursuant to SIPA Section 78eee(b)(4), this Court (per Hastings, J.)

---

1. SIPC is a non-profit corporation whose members include most interstate broker-dealers of securities. Membership in SIPC is automatic upon registration as a broker or dealer with the SEC under Section 15(b) of the Securities Exchange Act of 1934.

2. References to SIPA are to the United States Code. For convenience, "15 U.S.C." will hereinafter be omitted.

3. Under SIPA Section 78eee(d), SIPC is a "party in interest as to all matters arising in a liquidation proceeding, with the right to be heard on all such matters, and [is] deemed to have intervened with respect to all such matters with the same force and effect as if a petition for such purpose had been allowed by the court."

ordered the case removed to the Bankruptcy Court for the Southern District of Florida (Cristol, J.).

On December 29, 1987, Enrique A. Morey, Sr., submitted a claim to the Trustee. The Trustee denied the claim as untimely filed. By Memorandum Decision dated May 20, 1988, the Bankruptcy Court reversed the Trustee's determination. On or about May 27, 1988, the Trustee and SIPC separately appealed the Bankruptcy Court's Decision. On June 13, 1988, upon the Trustee's Motion to Consolidate Appeals from the Court's May 20, 1988 Memorandum Decision, the Bankruptcy Court ordered the appeals filed by the Trustee and SIPC consolidated *nunc pro tunc* to June 6, 1988.

## FACTS

Enrique A. Morey, Sr., is a Peruvian citizen who resides in Lima, Peru. He was introduced to Government National Mortgage Association certificates ("Ginnie Maes")[4] by GSC's advertisements in Peru. On February 2, 1987, Morey purchased a Ginnie Mae certificate for $24,228.54 through GSC ("the February trade"). On March 27, 1987, Morey made two additional purchases of Ginnie Maes for a total of $44,757.53 (the "March trades"). The purchases were reflected in sales confirmation statements provided to Morey by GSC.

The confirmation statements listed Morey's address in Peru: Jose Carlos Mariategue, 134 Lima 17, Peru. In addition, the statement for the February trade also included directly under his name and address, and next to the word "Special", the following: "c/o Total Bank, Acct # 00066553–0 2700 Coral Way, Miami, FL 33145–3271." The confirmation statements of the March trades likewise listed Morey's address in Peru, but in the same manner specified the following: "All Corres: P.O. Box 149016, Coral Gables, FL 33114–9016."

It is not clear from the record how Morey paid for the February trade. Although the record contains a copy of a receipt issued by GSC to Morey for his payment of the February trade, it does not show the method of payment. The March trades were paid for through a check issued on Morey's account at Total Bank.

Morey overpaid GSC with respect to the three trades. GSC issued a check on March 23, 1987, in the amount of the overpayment for the February trade, and consistent with the "Special" instructions on the confirmation statement for the February trade, made it payable not to Morey in Peru, but as follows:

Enrique Morey or Enrique A. Morey
JTWROS
Total Bank, Acct # 0006653–0
2700 Coral Way, Miami, FL 33145–3271

The reimbursement on the March trades was also made payable to Morey at "P.O. Box 149016, Coral Gables, FL 33114–9016," as specified in the "Special" instructions on the March trades confirmation statements.

Principal and interest payments on Ginnie Maes are paid each month. *The Ginnie Mae Manual* at 64. Before GSC was placed in liquidation, Morey received some principal and interest payments. On March 15, 1987, GSC issued a check for the principal and interest payment in the amount of $2,568.82 due on the February trade. The check was issued to Morey's account at Total Bank. On April 15, 1987, GSC issued a second check for the principal and interest payment due on the March trades. The check was made payable to Morey at the post office box in Coral Gables. However, although the checks were made payable to Morey in Florida, it appears from the record that at least one principal and interest statement was sent to him in Peru, in

---

**4.** A Ginnie Mae certificate represents a *pro rata* interest in a pool of FHA insured or VA guaranteed housing or real estate mortgages. GNMA Mortgage–Backed Securities Dealer Association, *The Ginnie Mae Manual* (1978), at 7. In essence, the mortgage banker assembles blocks of home mortgages against which, with the approval of the Government National Mortgage Association, are issued mortgage-backed securities, which in turn are sold to the public. *Id.* at 29. Certificates in a Ginnie Mae pool commonly are referred to as "pass throughs" because the issuer of the certificate collects principal and interest payments on the underlying pool of mortgages and distributes the payments to the certificate holders. *Id.*

that, a "Principal and Interest Statement" on GSC letterhead directed to Morey at the Lima, Peru, address, detailing the March payment on the February trade, was attached to his claim.

As authorized by the Bankruptcy Court, the Trustee caused to be published on May 29, 1987, a "Notice to Customers and Creditors of Government Securities Corporation and to All Other Parties In Interest" [hereinafter the "notice"]. The notice advised that GSC had been placed into liquidation under SIPA, and that Mr. Camp was appointed as trustee. The Bankruptcy Court approved the form of the notice. The notice was mailed to all customers and general creditors of GSC. Claim forms were to be mailed by the Trustee, but customers who did not receive them within seven days from the date of the notice could obtain them by writing to the Trustee at an address provided in the notice.

The notice specified the time limits for filing claims against the Debtor GSC. With respect to customer claims, it provided: "Customers of the Debtor who wish to avail themselves of the protection afforded to them under SIPA are required to file their claims with the Trustee within 40 days after the date of the Notice.... Customer claims will be deemed filed only when received by the Trustee." All "customer" claims were to be received by the Trustee on or before July 8, 1987. Such claims were to be sent to the Trustee by certified mail, return receipt requested. There is no dispute that Morey purchased rights to certain United States Government securities from GSC in the ordinary course of GSC's business as a broker-dealer of such securities, and was therefore a customer of GSC for purposes of SIPA liquidation proceedings.

The notice also specified the time limits for general creditors (i.e., broker dealers) to file claims, and stressed that *"[n]o claim of any kind will be allowed unless filed within six months after the date of this Notice"* (emphasis in original). The six-month outer filing period for all claimants, including customers, expired on November 29, 1987.

GSC was based in Coral Gables, Florida, with branch offices in North Miami Beach, Fort Lauderdale, Boca Raton, West Palm Beach, Tampa, St. Petersburg, and Sarasota, Florida. A majority of GSC's customers were also located in Florida. Accordingly, the Bankruptcy Court authorized the Trustee to publish the notice in several Florida newspapers, including the Miami Herald; Fort Lauderdale News; Palm Beach Post; St. Petersburg Times; Tampa Tribune; and Sarasota Herald Tribune; as well as in the national edition of the Wall Street Journal.

In preparing for the mailing of the notice, the Trustee's staff compiled from books and records of the Debtor GSC a list of names and addresses of GSC customers who had open accounts within the twelve months preceding the commencement of the SIPA liquidation proceedings. Mailing labels were generated for these customers. Morey's name, and his address, "Jose Carlos Mariategue, 134 Lima 17, Peru," appeared on the list, and a label was prepared for him.

The staff also compiled a second list of names and addresses of GSC customers having both foreign and domestic addresses, and generated a set of corresponding labels. Again, Morey's name at the same address in Peru appeared on the list and a second label was prepared for him. Even though some duplication of mailings would occur, copies of the notice and customer claim forms were mailed to the persons whose names appeared on the sets of labels. The Bankruptcy Court accepted the Trustee's contention that two copies of the notice with claim forms were duly mailed to Morey and not returned. Accordingly, Morey should have received the notice and claim forms in the mail at least once, if not twice.

As an asset of the GSC's estate, the list of names and addresses of its customers were sold by the Trustee to the brokerage firm, Kidder, Peabody & Co., Inc. (hereinafter "Kidder"). The sale was not a transfer of GSC customer accounts to Kidder. Rather, the customers' names and address-

es were sold to Kidder for purposes of soliciting the customers' business.

Sometime in late August, 1987 (approximately three months before the claims filing period expired), Morey received a letter from Kidder advising him that it was the "substitute broker" for GSC. The letter was written in Spanish and stated in pertinent part:

> You may already know that Kidder, Peabody & Co., Inc. has acquired from the intervenor [sic] of Government Securities Corp. (GSC), the right to deal with the clients of said company. Accordingly, Kidder, Peabody & Co., Inc. is the only company authorized to contact such clients. The financial problems of GSC, in accordance with federal law, will be resolved by means of the Securities Invest[o]r Protection Corporation (SIPC).
>
>   \*    \*    \*    \*    \*    \*
>
> Believe us that we understand the plight of the clients of GSC these past weeks as a result of what has occurred. Because of this, for your peace of mind and protection, I am pleased to inform you that all our accounts are insured up to $2,500,000, or up to 10,000,000. However, what we consider of utmost importance to you as an investor ... the continuity offered by a firm that has for more than a decade provided excellent service to its clients.[5]

A sentence in the letter refers (in Spanish) to an "interventor de Government Securities Corp.." The dictionary translation of "interventor" is "comptroller, supervisor, inspector, superintendent, auditor." Cassell's *Spanish English Dictionary* (1978). Appellee translates "interventor de Government Securities Corp." simply as "intervenor of Government Securities Corp.", while the Appellants' translation of this letter from a professional translator, Professional Translating Services, Miami, Florida, interpret the term as "Government Securities Corp. trustee in bankruptcy." Although the letter advised customers of the fact that GSC was in financial difficulty, that an "intervenor" had been appoint-

ed, and that SIPC was involved, it did not advise customers of the need to file a proof of claim before the six-month bar date.

Nowhere in the letter was there a reference to Total Bank. Nevertheless, upon receipt of the letter, instead of contacting his broker at GSC, or Kidder, or SIPC, Morey wrote in early September, 1987, to Total Bank, N.A., the depository of the GSC funds, to request that the Bank inquire into the status of his investments with GSC. The Bank was apparently unable to trace the whereabouts of Morey's certificates to the Trustee's office until November, 1987.

On November 17, 1987, almost two and one-half months after Morey had written to Total Bank to inquire about the status of his investments, the Bank telephoned the Trustee to inquire about Morey's account with GSC. In response to the inquiry, the Trustee sent a proof of claim package to the Bank which was not an agent or representative of Morey. The Bank received the package on or about November 20, 1987 (nine days before the expiration of the filing period).

On December 10, 1987, Total Bank contacted Morey who in turn had his son travel from Indiana to Miami to determine the status of his father's investments through GSC. Morey's son did not learn of the claims filing bar until December 17, 1987 (two weeks after the filing bar date). Morey's son subsequently retained counsel who did not file Morey's claim for $65,000 until December 29, 1987 (thirty days after the bar date). There is no dispute that notwithstanding Morey's late filing of his proof of claim, he held a valid customer claim against the estate of GSC.

Morey filed his proof of claim and a "Motion to Treat Claim as Timely Filed or, in the Alternative, to Reconsider and Allow the Claim." The Trustee issued his determination, whereupon Morey filed his Opposition to the Trustee's determination. The Trustee noticed a hearing on objections to claims including that of Morey. Because

---

**5.** The passage quoted above is from Appellee's counsels' translation of the letter, a copy of

which was attached to the February affidavit of Morey's son.

of alleged health problems, Morey was unable to appear at the hearing to give live testimony in support of his objection. Morey's counsel offered to obtain an affidavit of his client through the United States embassy in Peru if necessary. However, the Bankruptcy Court found sworn affidavits of Morey's son as proper testimony of non-receipt of the notice or the proof of claim package by Morey. Two affidavits were introduced into evidence. The first was executed on December 29, 1987 with the second affidavit executed on February 18, 1988. The Trustee objected to the use of both these affidavits.

The Trustee's central objection to Morey's claim, as articulated at the time of the hearing before the Bankruptcy Court, was that the six-month bar date under SIPA was final and that, so long as the Trustee mailed and published the necessary notice to customers and general creditors of GSC (regardless of whether such notices were ever received or read), any claim not timely filed is absolutely barred. The Bankruptcy Court rejected such a "narrow" reading of SIPA, and the Trustee's and SIPC's view that the traditional inherent equitable powers of United States Bankruptcy Courts do not apply in SIPA proceedings.

Morey's counsel argued that Morey never received actual or constructive notice of the need to protect his claim until after the filing period for customers and general creditors had expired. Counsel further argued that constructive notice was not reasonably calculated to provide an effective means of notice to Morey in Peru, and asserted that Morey's failure to file his claim was not the result of dilatory actions or negligent omissions, but simply the failure to receive timely and proper notice.

The Bankruptcy Court took judicial notice of the fact that the Trustee properly mailed the notice of the liquidation and claims filing period and the proof of claim forms to Morey at his address in Peru, and that the items had not been returned. In the Court's view, this mailing created a presumption that the notice and forms had been received by Morey. However, the Court found that this presumption was re-

butted by the affidavits of Morey's son, wherein he stated that his father had not received the notice and forms. The Court further found that this presumption was rebutted by the fact that the items were mailed to South America, "where the postal service has a notorious reputation for losing mail." *In re Government Securities Corp.*, No. 87–0245 at 4 (Bankr.S.D.Fla. May 20, 1988). Based on the its findings of fact, the Bankruptcy Court proceeded to allow Morey's late claim, stating that

> [on] the basis of fairness and equity, the court grants the allowance of Mr. Morey's claim. The court finds that it cannot impose such a serious penalty upon claimant when Claimant never received actual notice of GSC's bankruptcy and when constructive notice by publication was not reasonably calculated to apprise claimant in Peru that his investments in the United States were in jeopardy.

*Id.* In the alternative, the Court allowed the filing of Morey's late claim based on 11 U.S.C. § 502(j). Section 502(j) provides in pertinent part:

> A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case....

In determining that the late filing could be permitted under Section 502(j), the Bankruptcy Court applied an excusable neglect standard and held that the Morey's failure to file on time amounted to excusable neglect. The Court further held that allowing Morey's claim would not prejudice other customers or creditors or effect the administration of the estate since the length of the delay was only thirty days. The Court found that Morey did not file a timely proof of claim for reasons beyond his control as actual and constructive notice was wholly ineffective and insufficient to allow him to protect his interests. The Court found that upon notice of GSC's bankruptcy, Morey acted in good faith, and diligently sought to institute his claim by having his son fly to Miami to protect his interests and by procuring local counsel

within days of his receipt of the notice of the SIPA proceedings.

## DISCUSSION

### SIPC Fund

SIPA requires SIPC to establish a fund for the satisfaction of customer claims against member broker-dealers of securities. SIPA Section 78ddd. This fund is established via assessments upon its members and if the SIPC's fund should become inadequate, SIPA authorizes a borrowing against the U.S. Treasury of up to one billion dollars. SIPA Sections 78ddd(f), (g), and (h).

Under SIPA, customer claims will be satisfied to the maximum extent possible from the assets of the defunct member broker-dealers of securities. Customers are to share on a *pro rata* basis in any fund of customer property and any general estate. SIPA Section 78fff-2(c)(1). If customer property and estate assets are inadequate to satisfy customer claims, SIPC will supplement the amounts available for distribution pursuant to SIPA guidelines and within the limits provided by the statute. To the extent of its advances, SIPC is subrogated to the claims of such customers. SIPA Section 78fff-3(a).

Under Section 78fff-3, SIPC is authorized to advance the trustee, in order to satisfy net equity claims of customers, not more than $500,000 per customer, and in no event more than $100,000 for that portion of a claim which is for cash rather than for securities. Regardless of the assets of the failed broker-dealer of securities, each customer with a valid claim is assured satisfaction within the limits indicated.

### Purposes and Nature of SIPA Proceedings

Congress enacted SIPA to: protect individual investors from financial hardship; to insulate the economy from the disruption which can follow from the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss. S.Rep. No. 1218, 91st Cong., 2d Sess. at 4 (1970) U.S.Code Cong. & Admin.News 1970, p. 5254. Notwithstanding the special protection afforded customers, a SIPA liquidation proceeding is in essence a bankruptcy proceeding. SIPA Section 78fff(b) provides that to the extent consistent with SIPA, the SIPA liquidation proceeding "shall be conducted in accordance with chapters 1, 3, and 5, and subchapters I and II of chapter 7" of the Bankruptcy Code.

### The Six Month Limitation Period For Filing Claims

Under SIPA,[6] customer claims must be filed no later than sixty days after publication of the liquidation notice to receive maximum protection. The outer time limit for filing claims, for customers and general creditors alike, is six months from the publication date. Although a customer may submit a claim between the initial filing period (sixty days or less) and the outer period of six months, he or she may lose substantial rights. For example, a customer who files a claim for securities within the initial period must have the claim satisfied by the delivery of the securities, to the extent the latter are available. SIPA Section 78fff-2(d). In contrast, the customer

---

**6.** Section 78fff-2(a)(3) provides:
  (3) **Time Limitations.**—No claim of a customer or other creditor of the debtor which is received by the trustee after the expiration of the six-month period beginning on the date of publication of notice ... shall be allowed, except that the court may, upon application within such period and for cause shown, grant a reasonable, fixed extension of time for the filing of a claim by the United States, by a State or political subdivision thereof, or by an infant or incompetent person without a

guardian. Any claim of a customer for net equity which is received by the trustee after the expiration of such period of time as may be fixed by the court (not exceeding sixty days after the date of publication of notice ...) need not be paid or satisfied in whole or in part out of customer property, and, to the extent such claim is satisfied from moneys advanced by SIPC, it shall be satisfied in cash or securities (or both) as the trustee determines is most economical to the estate.

who files after the initial period but within the six months, will have the same claim satisfied in securities or in cash (based upon the value of the securities on the date SIPC files the application to have the firm paced in liquidation), depending upon which the trustee determines is most economical to the estate. Thus, if it less expensive to satisfy the customer claim in cash, the trustee may do so. The reasoning for the initial filing period is set forth in the legislative history of SIPA

Section 78fff–2(a)(3):

The trustee would be authorized to satisfy claims filed more than the time established by the court, not to exceed 60 days but less than six months after the date of publication of notice in the most economical way, thereby protecting SIPC against speculation by customers who might withhold their claims for a period of time to see if a change in the market might give them a more valuable distribution.

H.R. 746, 95th Cong., 1st Sess. at 29 (1977).

A main reason for limiting the length of time within which claims may be filed in a SIPA liquidation proceeding is to achieve some degree of finality to the demand upon the SIPC fund. As the Bankruptcy Court stated in *In re OTC Net, Inc.*, 34 B.R. 658 (Bankr.D.Colo.1983):

It is obvious that Section 78fff–2(a)(3) was intended to bar untimely claims of those seeking to share in a limited insolvent estate. Congress was trying to strike a balance between SIPA's goal of customer protection and the burden imposed upon the Securities Investor Protection Corporation (SIPC) and its members who must advance funds to satisfy net equity claims of customers. Also, by providing for a strict statute of limitations, Congress sought to ensure a prompt liquidation process. 15 U.S.C. § 78fff(a). *See Hearings on H.R. 8331 Before the Subcomm. on Consumer Protection and Finance of the Comm. on Interstate and Foreign Commerce,* 95th Cong., 1st Sess. at 178 (1977); H.R. Rep. No. 746, 95th Cong., 1st Sess. 28 (1977) [customers must file "promptly, effecting the need for early certainty in

regard to the allocation of customer property"].

*Id.* at 660 (footnote omitted). *See also In re Government Sec.*, 95 B.R. 829, 832 (S.D. Fla.1988) (Ryskamp, J.) (Concern for the prompt completion of the liquidation process and early certainty as to the extent of available assets and demands made against the assets, underscore the need for a strictly observed filing period).

### Analysis

In basing its allowance of Morey's claim on equitable grounds, the Bankruptcy Court found that Morey had not received actual notice of the claims filing period and that the Trustee's publication of the notice was not sufficient to apprise Morey of the need to file a claim. For the reasons set forth below, this Court holds that the Bankruptcy Court's conclusions of law were incorrect, and further finds that the Court's findings of fact were clearly erroneous.

### Section 78fff–2(a)(1)—notice of proceedings

Under SIPA Section 78fff–2(a)(1), entitled "Notice of Proceedings," a SIPA trustee:

shall cause notice of the commencement of proceedings ... to be published in one or more newspapers of general circulation in the form and manner determined by the court, and at the same time shall cause a copy of such notice to be mailed to each person who, from the books and records of the debtor, appears to have been a customer of the debtor with an open account within the past twelve months, to the address of such person as it appears from the books and records of the debtor. Notice to creditors other than customers shall be given in the manner prescribed by Title 11, except that such notice shall be given by the trustee.

It is uncontroverted that Morey was mailed a copy of the notice of the liquidation and filing period with claim forms, not once, but twice. In addition, it is uncontroverted that the Trustee published notice in six

Florida newspapers and in the Wall Street Journal which are distributed domestically in the areas where GSC maintained its offices as well as abroad." SIPA only requires notice by publication and by mail and does not require actual knowledge or receipt of notice." *In re OTC Net, Inc.*, 34 B.R. at 660. Accordingly, the fact that Morey may not have received the notice nor seen the published notice does not necessarily mean that notice was inadequate.

### mailings—actual notice

■ The Trustee's mailing of the notice was reasonable under the circumstances. With over 7,000 customers to whom to mail the notice, the Trustee's service of the notice and claim forms by first class mail was appropriate, and is in fact a procedure which has been found to be acceptable "when balanced with the additional costs of other methods of notice." *S.E.C. v. J. Shapiro Co.*, 414 F.Supp. 679, 680 (D.Minn., 4th Div., 1975). It cannot be denied that the Trustee's mailing of the notices was a "serious effort" to inform customers and other creditors of the liquidation of GSC. As previously stated, special procedures were followed to ensure that customers in the international division of GSC, in particular, received notice by mail. In fact, these procedures led to Morey being mailed not one, but two, notices of the liquidation proceedings.

The Bankruptcy Court took judicial notice of the fact that the Trustee mailed notices and proof of claim forms to Morey at his Peru address and that these mailings were not returned to the Trustee. According to the Bankruptcy Court, this gave rise to a presumption that the Trustee mailed the notices and proof of claim forms to the proper address and that Morey received the same. However, the Bankruptcy Court found that Morey rebutted this presumption by proffering evidence of non-receipt of the notices and claim forms.

This Court holds that although such a presumption may be rebutted by testimony of non-receipt, such testimony must be "direct," *Merrill–Lynch, Pierce, Fenner & Smith, Inc. v. Dodd*, 82 B.R. 924 (N.D.Ill. 1987), and the evidence must be "substantial." *In re Moseley*, 74 B.R. 791, 802 (Bankr.C.D.Cal.1987). Upon careful review of the record and the affidavits contained therein, this Court finds that Morey failed to proffer reliable evidence of non-receipt of the notices and claim forms.

In spite of the fact that matters of credibility were at issue, the Bankruptcy Court chose not to judge Morey's candor and credibility based on his live testimony, nor even on some form of affidavit by him. Instead, the Bankruptcy Court's determination that Morey did not receive actual notice of the liquidation proceeding and of the time limit for filing a claim rested on unsupported representations contained in Morey's son's affidavits that his father had not received the notices mailed to him by the Trustee, and on the Court's gratuitous finding, as to which no evidence was adduced, that "the postal service [in South America] has a notorious reputation for losing mail." 87–0245 at 4.

A review of both of the son's affidavits reveals that they are solely the testimony of Morey's son. Although the affidavits of Morey's son purport to be based upon the son's personal knowledge, the basis for this knowledge is not explained. Indeed, a review of the affidavits suggest that the son had no first-hand knowledge of the events until at least December 10, 1987, when his father telephoned him in Indiana and asked him to travel to Miami. If the son did not reside in Peru after May 29, 1987 (the publication date of the notice), it is unclear how he could have known that his father did not receive the notices mailed twice to him by the Trustee. Yet the Court made clear that the mere assertion by a third-party with no personal knowledge would suffice to prove non-receipt.[7]

---

7. The dialogue between the Bankruptcy Court and counsel for Morey was as follows:

  THE COURT: As I understand it, the power of attorney is not that this is the son's knowledge, he is signing a name because of the communications, I mean the geographic distance? This purports to be the statement of Morey.

  [Counsel for Morey]: That's correct, and if the Court, if there is any problem, I will endeavor

In addition, although the power of attorney executed by Morey authorized his son to take all actions necessary to enforce his claim against GSC, it did not, nor could it, give his son the authority to testify as to matters not within his personal knowledge. Accordingly, this Court finds that Morey's son's representations of his father's non-receipt of the notices were not merely hearsay, but hearsay within hearsay. In addition, in view of the paternal relationship between Morey and his son, the affidavits do not have such "circumstantial guarantees of trustworthiness" as to be admissible under the general exceptions to the hearsay rule. Fed.R.Evid. 803(24) and 804(b)(5). Given the Trustee's showing that not one, but two notices were mailed by the Trustee on May 29, 1987, and that neither of the claim packages were returned, and in light of Morey's failure to proffer evidence of non-receipt, this Court finds that the Bankruptcy Court's finding of fact that Morey did not receive the notices by mail is clearly erroneous.

### publication—constructive notice

■ The costs to an estate would be unduly burdensome if a trustee were required to publish in every locality in which a claimant might be present. Determination of whether notification is reasonable requires consideration of a few factors: determination of the best means, tempered by considerations of the costs and the effect of such costs upon the estate and its creditors as a whole.

> In bankruptcy, the court has an obligation not only to the potential claimants, but also to existing claimants and the petitioner's stockholders. The court must balance the needs of notification of potential claimants with the interest of existing creditors and claimants. A bankrupt estate's resources are always limited and the bankruptcy court must use discretion in balancing these interests when deciding how much to spend on notification.

to provide an affidavit signed by Mr. Morey, Sr., but I think that's—
THE COURT: Well, I'm going on the basis that it is represented and the Court is accept-

*Vancouver Women's Health Collective Soc. v. A.H. Robins Co.*, 820 F.2d 1359, 1364 (4th Cir.1987). It is sufficient if publication is had in "one or more newspapers of general circulation." SIPA Section 78fff–2(a)(1). This requirement was satisfied in the instant case.

Attached to the affidavits of Hector A. Cruz and David Rosenstein are lists of names and addresses of all customers and other creditors of GSC to whom notice of the liquidation proceeding was mailed. A review of the list shows that the vast majority of customers resided in various cities in Florida. As previously mentioned, GSC itself was based in Coral Gables, Florida, with several branch offices throughout the State. By comparison, only a small number of GSC customers were located abroad. Given these circumstances, the cost of having the Trustee cause the notice to be published in every city which the more than 7,000 customers resided would have been prohibitive.

In finding that the publication of the notice in newspapers did not afford Morey constructive notice, the Court relied on the affidavit from one of Morey's attorneys to the effect that the Wall Street Journal circulated in Lima, Peru, to the extent of 20 to 30 copies. However, there is no contention made in the affidavits of either Morey's son or of counsel that Morey was not a subscriber to the Journal on May 29, 1987 (the publication date of the notice), or did not otherwise read the May 29 edition. Based on the foregoing, this Court finds that the Trustee's publication of the liquidation notice in six Florida newspapers and in the national edition of the Wall Street Journal was reasonable, and fully satisfied the requirement of SIPA Section 78fff–2(a)(1) that the trustee cause publication of the notice "in one or more newspapers of general circulation," and that the Bankruptcy Court's finding to the contrary was clearly erroneous.

ing the position that he did not receive actual notice.
Transcript of Apr. 26, 1988 at 30.

*due process*

■ Even if this Court were to assume *arguendo* that Morey did not receive actual notice of the liquidation proceedings and the need to file a claim, the publication of the notice in the manner stated above satisfied the due process standards pronounced in *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), in that this Court finds that the notice was reasonably calculated, under all the circumstances, to apprise Morey and other customers and creditors, of the pendency of the liquidation proceedings and the need to file a proof of claim before the expiration of the filing bar date. *See, e.g., San Augustine Co., Tex. v. Cameron Co. Water Imp. Dist.,* 202 F.2d 932 (5th Cir. 1953).

### Section 78fff–2(a)(3)—time limits for filing

■ Assuming *arguendo* that Morey did not receive actual nor constructive notice, SIPA contains no exceptions to the filing requirement in such circumstances. Given the specific time limits for the filing of claims set forth in SIPA Section 78fff–2(a)(3), and the reasons underlying these limits, this Court holds that, but for the exceptions set forth below, the time limits for filing claims are mandatory and may not be extended by the exercise of some equity power. *In re Government Sec.,* 95 B.R. at 832; *In re Weis Sec., Inc.,* 1 Bankr.Ct. Dec. 1572, 1573 (S.D.N.Y.1975); *Securities Investor Protection Corp. v. G.S. Omni Corp.,* No. 82 J 0495 at 2 (Bankr.Colo.1983) (SIPA "does not allow a court to exercise its equitable powers in contravention of the specific language of the statute"); *See, e.g., Miller v. Austin,* 72 B.R. 893, 895 (S.D.N.Y.1987) (holding no extension available to claimant who relied on erroneous advice by her sales representative that her account had been transferred from a debtor to another brokerage firm, and that no claim need be filed); and *In re Investors Sec. Corp.,* No. 80–1303, slip op. at pp 2–4 (W.D.Pa.), *aff'd,* 673 F.2d 1299 (3d Cir.1981) (holding that claimant who was unaware of liquidation of a debtor because the president of the debtor fraudu-lently concealed this from them, and who did not receive actual notice of the liquidation because of poor mail service and did not subscribe to the newspaper in which notice is published, must file within the period allowed in SIPA or be time-barred).

Although the trustee and a court have discretion to extend this period, requests for extension must be filed within the six-month period, and for the reasons specifically set forth in Section 78fff–2(a)(3). Claims by governmental bodies, infants or incompetents without guardians can be submitted after the six-month limitation, but even then, only if the request for an extension is made before the six months lapse and cause is shown. Morey did not come within any of these exceptions. Notwithstanding this fact, however, the Bankruptcy Court allowed Morey's claim based on "fairness and equity." Accordingly, because this Court hereby holds that the time limits set forth in Section 78fff–2(a)(3) are mandatory, and could not be extended by a bankruptcy court's equitable powers, this Court hereby finds that the Bankruptcy Court erred in allowing Morey's claim on the basis of fairness and equity.

### Section 502(j)—reconsideration "for cause" of claims that have been allowed or disallowed

■ The Bankruptcy Court alternatively allowed Morey's claim under Section 502(j) of the Bankruptcy Code which permits the reconsideration "for cause" of claims that have been allowed or disallowed. This Court finds that the Bankruptcy Court's reliance on Section 502(j) was erroneous for the reasons set forth below.

First, even if this Court were to assume *arguendo* that Section 502(j) created an exception to the timely filing of claims, the Section would be inconsistent with SIPA and therefore not applicable. As previously stated, SIPA Section 78fff(b) makes "chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11" applicable only to "the extent consistent with the provisions of" SIPA. The exceptions in SIPA to the timely filing of claims is clear, and as

the Court stated in *Miller v. Austin,* 72 B.R. at 897, "... even if the Bankruptcy Code presently provided for an express exception to the time limits for filing, the provisions would not be applicable to SIPA liquidations since it would contradict the clear words of SIPA § 78fff–2(a)(3). *See* 15 U.S.C. § 78fff(b)." *See also In re Government Sec.,* 95 B.R. at 833 (same).

Secondly, Section 502(j) only applies to the "reconsideration" of claims. However, the matter before the Bankruptcy Court was not a reconsideration of a claim, but rather its initial "consideration" of Morey's claim. This distinction is important.

In a SIPA liquidation, a claim is filed with the trustee and not, as in ordinary bankruptcy, with the clerk of the court. Unlike the procedures in straight bankruptcy, a SIPA trustee reviews the claim and makes a determination. If the claim is denied, the claimant may object, and the trustee will obtain a hearing before the bankruptcy court on the objection. The court then considers the correctness of the trustee's determination of the claim. However, at no point prior to that time will the court have the opportunity to consider the claim. Accordingly, because in the instant case the Bankruptcy Court never "reconsidered" Morey's claim, Section 502(j) was inapplicable.

Thirdly, the result stemming from the Bankruptcy Court's application of Section 502(j) clearly demonstrates that its reliance on said Section was error. It would defy common sense to say that in initially deciding a claim, a trustee or court must be governed by the limits of Section 78fff–2(a)(3), and yet, on reconsideration, may, in their discretion, ignore Section 78fff–2(a)(3) and reconsider their decision on the claim based on equitable grounds under Section 502(j). The Bankruptcy Court's interpretation and application sanctioned such a result. Indeed, carried to an extreme, the Bankruptcy Court's application of Section 502(j) would invalidate large portions of the Bankruptcy Code and SIPA.

Fourthly, even if excusable neglect could be applied in a SIPA proceeding, the standard is not met under the facts of instant case. For purposes of establishing neglect under Bankruptcy Rule 9006(b), a movant must show that "the failure to timely perform a duty was due to circumstances which were beyond the reasonable control of the person whose duty it was to perform." *In re South Atlantic Financial Corp.,* 767 F.2d 814, 817 (11th Cir.1985). As previously stated, it is undisputed that Morey received the August 6, 1987 letter in Spanish from Kidder, Peabody & Co.. The Bankruptcy Court found that the letter was received in late August 1987—at least three months before the filing period expired. Among other things, the letter alerted Morey to the fact that GSC was in financial difficulty, that an "interventor de Government Securities Corp." had been appointed, and that SIPC was involved. Rather than telephoning Kidder, his broker at GSC, or SIPC, Morey telephoned his bank, and then waited three months for an answer.

Based on the foregoing, this Court finds that the Bankruptcy Court's finding that Morey's failure to file on time amounted to excusable neglect was erroneous. Morey's failure to file on time was not due to circumstances beyond his control. Rather, upon receipt of the letter from Kidder, Morey sought haphazardly to inquire about his investments, and failed to act diligently in protecting his interests.

The Bankruptcy Court's finding that allowance of Morey's untimely claim would not prejudice other creditors or customers, or effect the efficient administration of the estate was also erroneous. If a claimant was provided sufficient notice but is nevertheless allowed to share with other customers, its claim causes a direct reduction of a general estate. To that extent, allowance of such a claim prejudices general creditors who file their claims timely, and customers whose claims exceed the limits of SIPA protection and who also must share in a general estate.

### CONCLUSION

The Trustee gave Morey all the notice afforded him by statute. The Trustee complied with the statute when he caused notice to be published and mailed to each of the customers of GSC as their addresses

appeared from GSC's books and records. Having chosen to do business in Florida by his purchase of Ginnie Maes through GSC, Morey was obligated to keep himself informed of the occurrences that might affect his interests. Because Morey failed to do this, he must abide by the consequences of this misfortune. Accordingly, for the reasons set forth above, it is hereby

ORDERED AND ADJUDGED that the holding of the Bankruptcy Court is RE-VERSED, and Claimant/Appellee's, Enrique A. Morey, Sr., claim is DENIED as untimely filed.

DONE AND ORDERED.